3 20 0 2 2 1 in re Marriage of Julie Portillo Appley and Daniel Josue Portillo Martinez appellant. Thank you. Good morning. Good morning. Um, Mr. Angel, you can start whenever you're ready. Thank you. May it may it please the court, Your Honor, this this case is here on an appeal regarding the order of protection entered against Daniel Portillo Martinez involving his two minor children MJP and MCP, which was entered on, I believe, February 7 2020. And that's, and also there might have been a companion order at that time. The issues in this matter are basically three, three, four, one is the issue of appeal ability raised in the appellate's brief. The other issue is, is basically what legal standard applies as far as admitting hearsay statements of minor children, and, and especially where they're too young to testify. And then the issues there would be actually I guess it's four issues. One is cooperation, which applies under any potential standard, and then reliability. With the appeal issue just appeal ability issue just briefly, we, the notice of appeal basically said that Mr. Portillo was appealing the order of protection, particularly those restrictions which are listed I believe is on C 151, and the order of protection are identical to those issued in C 160, which is supposedly the part of the emergency order entered in the, as far as the, the, the D case, even though they were both in the D case, and the, the case to say is, as I mentioned, the reply brief, the issue, the notice of appeal is liberally construed. Also the extent that it is an emergency order, it's subsumed in the final order of protection. And also it's extent there is emergency order. It's the subject matter before this court, I don't think there was any argument that we could modify that while this appeal is pending. So that's the first issue. The second issue is regarding what applicable standard applies in admitting hearsay statements of abuse by a minor child who is unavailable. And there's two potential standards, 606.5 of the Illinois Marriage and Dissolution of that is under the applies in civil cases. The other applicable statute is section 205 of the Illinois Domestic Violence Act. And there's actually been a split of authority on, on this. Mr. Martello acknowledges that the, the, this court and countrymen versus Racy and Daria W both have found that section 606.5 is the applicable statute, whereas in the second district and fourth district have both found that it's section 2601 is the applicable standard. The difference, the differences is that section 2601 prior to admitting statements of a minor child requires a trial court to cite some indicia of reliability regarding those statements in terms of time, place, and content of them. And the most recent pronouncement on this subject has been a RICA, which fourth district in 2018, which basically said that even though, while the argument is that 606.5 is the more the Illinois Domestic Violence Act under 205 incorporates the code of civil procedure, it doesn't mention the IMDMA and, and noted that as per Flannery, that the Domestic Violence Act addresses physical care, but doesn't reference the IMDMA and also addresses the issue of the section 2601 using the phrase jury, which as a RICA says is that's basically borrowed from criminal cases and it applies whether it's a bench trial or jury trial in a criminal case. So the RICA basically outlines in paragraphs 21 through 23, which why they believe section 2601 applies and that's we're making this issue for nothing else because eventually preserving it because eventually I believe the Supreme Court will probably have to address it. Also, the reason as far as reliability being important goes is we are basically in order protection is being used here to effectively sever a parent-child relationship and should be a situation where a parent would have more protection than a non-parent, so that's reason why reliability issue tips towards applicability of 2601. In any event, and as far as how the reliability affects this case is that the time, place and contents of the statements there, they were supposedly made 22 hours after the minor child, minor children left Daniel's care. Nobody other than the, other than Julie Portillo and possibly her mother heard these statements. The statements are nonspecific as far as what was allegedly done or whether, whether it was just basically done and anything even was done, it was done possibly just for purposes of taking care of the child and also these statements come up in the middle of a petition to modify parenting time. Daniel had filed a petition to modify parenting time on June 4th, 2019 and the, on October 11th, 2019, the parties are referred to mediation 10 days later, we have an emergency petition to modify parenting time. But in both cases, the issue is whether the US statute applies, there's a requirement for cooperation and cooperation requires, it's discussed in various cases, but usually what you're looking for is statements made to independent third parties, no motive to lie statements where they're giving details that wouldn't, wouldn't be known or made unless the accusation is true, that there's physical evidence, things like that. In this case here, as far as cooperation is, we have no medical testimony. As far as any findings consistent with abuse, DCS found this unfounded. There's no testimony. I think a same test was done. There's no testimony there. I'm sorry, can I interrupt you a second? And with respect to the lack of cooperation, are you, it's my understanding is you're objecting. You're not talking about the weight of the evidence. You're saying it shouldn't have been admitted, shouldn't have been admitted for lack of collaboration. Is that, am I right? Not exactly. Uh, justice Schmidt, uh, we are seeing first, first we're saying it shouldn't even have been admitted under 2601, um, uh, because there was no finding as far as time, place or reliability. But then more importantly, we're saying is that regardless of which statute applies, um, there has to be the statutes both require cooperation, which is, it's just these statements, um, these hearsay statements, assuming they were even made are not enough. There has to be something else to show that, um, well, okay. So my question is, does that corroboration go to the weight to be given the evidence or the admissibility of the evidence? Corroboration goes to the, uh, weight of the evidence. Okay. All right. Thank you. You've answered my question. Thank you. Yes. And, uh, uh, as far as, and in this situation here, um, there's no corroboration. As I mentioned, there's no DC of us said this one is unfounded. We don't have medical testimony. Um, it's done in the context of a petition to modify. This wasn't a case where a third party said, Hey, I think the children are being abused. You need to take a look at it. We have, uh, we have a guardian at Lytton who says that he thinks there's something off with a father child relationship, but it could be anything. He couldn't really eliminate any causes and he never saw the, the, the, the, the child with the, with the father. Uh, we have a huge gap, um, between, uh, when this, when the children left Daniel's care and when this basically, I think it was a diaper rash was found, uh, cases where they have found it in corroboration. And for example, AP where it was a torn hymen medical testimony, they eliminated alternative causes and there was detailed statements. Ashby was another case we cited where there was purple candy. The babysitter saw residue of purple candy on the child's, uh, chest. Uh, there was medical findings after the father's confronted the child returned without, uh, any signs. Uh, whereas other cases such as, uh, Flannery, um, it was a fair, they said that, uh, the, uh, a fairly normal physical exam, um, just the fact that there was vaginal redness, uh, wasn't sufficient, um, LR was another case where his Warren parents in the context of, uh, I think a petition to modify or the father, maybe it even turned the mother in, uh, and then statements only to the, the parent. So, um, cases where the courts have upheld as far as corroboration involved a lot more detail than that. Rather the cooperation here is just a litany of lack of better word, bad acts, such as, uh, Daniel, uh, admitting that he looked at a vagina of a minor child when he was 14, living in Guatemala, uh, alleged incident with Julie's sister, um, and one incident with the, a, uh, girl from the party's church, which, um, in the response brief, the, uh, appellee tries to make much worse than it was suggesting that he thrusted his hips towards this minor girl, which not only is there not any evidence of that, but if there was, uh, he's not going to be welcomed back in the church. In fact, he's probably going to be, be arrested. Uh, so where, where the courts have allowed other bad acts as far as corroboration, it usually involves a juvenile court context where it's occurring fairly similar in time, same types of acts, same types of victims. Um, things like that, um, yes. Um, did the trial court talk to the child at any point? Not to my recollection. I don't believe he talked to, actually there's two children. I don't believe he talked to either one of them. And should we know the younger child was the one who supposedly made these statements of being, uh, hurt by his father, whatever that means, the, uh, the older child did not make any, uh, statements, uh, to that effect. And I, my recollection is the trial judge talked to neither child rather was the, uh, guardian let him talk to one parent and did not talk to, uh, did not talk to my client. Uh, so he didn't have an opportunity to observe him with the minor children, which I believe was the case. LR says that's, that's a big, big gap because, um, and for instance, it's very possible that may have seen the children with them and they would have been possibly just fine and not afraid of them, um, and in terms of the harassment argument, um, harassment, um, has been, before you go there, could I follow up on my question? Sure. Um, beyond corroboration, was there any effort made to determine anything about the child's appreciation of the need to be truthful? Or was there anything balancing the, um, probative value versus the prejudicial impact was, was there any of that? As far as determining the ability of the child to be truthful and understand what they're saying. Not that I'm aware of. I, the only closest thing I remember to that was the guardian just saying I met the child 25 minutes ago and I just didn't want to push him. Um, but as far as, uh, as far as the extent there was any appreciation of that, it might've been through DCFS or, or some, or maybe at the, uh, maybe through the medical personnel, but they didn't testify on, did not indicate anything as far as, um, as, as, as indicative of abuse. So, uh, other than whatever they may have done, I'm not aware of anything. Uh, thank you. Okay. Um, what, what's the harassment issue? Um, uh, basically harassment has been addressed by this court a couple of times over the last 20 years. Uh, uh, Jackson was one case, uh, Radke was another. And basically what harassment is, is it requires some conduct, which is beyond the pale, um, that's not done to accomplish a reasonable purpose. And, um, there's the parties have clearly had ongoing acrimony since at least March, 2019, once Daniel said he wanted more time, but for harassment, it has to be something more than just I'm annoyed. For example, one complaint was that Daniel showed up at a prompt care where the child was ill. Julia probably did not want him there, but there's reasons to be there. Or, um, the homestead festival where he showed up, um, that was one where it was his weekend, although he gave, gave her the child. And the fact of the matter is that just in a small town, you're going to run into people. Um, and so the question is here is, is not whether the conduct is simply annoying or maybe even whether it's prudent, but is it just some conduct, which is so, um, beyond, so, uh, the order that justifies entering an order of protection and severing. Uh, or eliminating his time with his, his children. And, uh, that that's just not shown here. Most of the cases that have discussed this involve cases where somebody is trying to rekindle romantic interest. There's really no evidence in that case. So, uh, for those reasons, we respectfully request that the court's order of protection be reversed. Um, and, and, and, uh, uh, relief in accordance with that. Thank you. Thank you, Mr. Angel. Um, Ms. Stroh. May it please the court. My name is Morgan Strow. Uh, Mr. Angel and I seem to be having two separate arguments and, uh, he seems to dismiss my jurisdictional argument. There were two pleadings that were argued at the trial level, one under the domestic violence act, the second under the marriage act, he completely ignores the second order issued under the marriage act, which also grants, let me interrupt you for a second and aren't those orders. No, they fall under two separate statutes and they have, uh, two separate, um, they have separate requirements as to what must be met in order, uh, to, to the relief. Okay. Thank you. Both, both of the orders though, do set out, uh, restrictions on parenting time. That's correct. Higher supervision. Correct. So that issue is before us. Supervision is before you with respect to the order of protection, but I'm saying, or I'm arguing that he ignores the marriage act order and therefore that relief should stand under the marriage act order because it's never addressed and he forfeited his right to appeal that relief granted under the marriage act order. And he argues the order of protection. And that, that includes the supervised visitation parenting time, as well as other, uh, more significant remedies, uh, that the marriage act order does not address. And my argument is even if you overturn the order of protection, uh, that the marriage act order should stand. And within that, uh, the relief granted by it supervised parenting time. So you're saying that even if in our consideration of the order of protection, we find that it was improper to limit his visitation and to require supervision that, that can't apply to the other order. Yes. Okay. And my basis for that is that one order is not, uh, within the umbrella of the other, there are two separate lines of orders under two separate prayers for relief under two separate petitions. An emergency order of protection filed pro se by my client, Julie Portillo, and then a separate emergency order prepared, prepared by me, signed by her and then filed by me. These were two separate, uh, requests and prayers for relief. And one, they were both granted, but only one was appealed and it was outright ignored. I believe it had one reference just by name only within the brief, but never mentioned in the notice of appeal that marriage order involves, uh, issues of parenting time, which would be entitled to expedited hearing by you. Uh, and that was not, um, that was not honored because it wasn't addressed in the documenting statement. It wasn't addressed in the notice of appeal. It is completely dismissed and put under the rug by Mr. Angel as if it doesn't exist. And I'm shouting, it exists. It exists. Please read this when the, um, trial court entered the, your client's, um, emergency order as to the pair under the parenting, um, order and the marriage act, um, was that in a separate proceeding from the pending petition to modify that had been filed by, um, Mr. Angel's client. So the petition to modify was never heard. Initially. We thought we were going forward on all three petitions. And then, uh, Daniel's counsel, his trial counsel at the time said, your honor, we haven't done discovery. We're not moving forward on the petition to modify. So it was strictly on the two petitions followed or filed, uh, by our, our side, Ms. Portola and myself. And that was the only thing for the emergency, um, hearing on parenting time under the marriage act was the, were the allegations that were made in the emergency order of protection? Correct. Yes. They were all together. It was based on the same facts and circumstances. That's true. Okay. And it was the same hearing. It was yes. Thank you. Yes, absolutely. Um, but then addressing Mr. Angel's main argument, which is the, um, the admissibility standard, uh, I believe that's been well decided by this court and both Daria and countrymen. Uh, and the judge, the trial court read those cases. And of course that's how we proceeded. Um, the other issue that Mr. Angel argues no corroboration. Well, the evidence was never rejected to, I mean, there was one objection at the very beginning of hearing saying judge, I think you should, you know, really not consider Daria and countrymen, but proceed under these other, uh, out of district cases and with that, I object, but there was never a request for a standing objection that objection was never renewed at any time the evidence was presented. There was no argument at the end of hearing that there should be, uh, that council renewed her objection. Uh, it was completely ignored. And then at that point, there was never any argument to the trial court of no corroboration that the trial court should find in any other way, it was completely. Uh, ignored except for the one mention of, um, the objection at the very beginning, but as my brief pointed out with emotion and lemonade, um, which is similar to the motion that we had in this case, that objections need to be renewed, that continuing objections are disfavored and when continuing objections are, well, let me ask you this, uh, because, uh, opposing council, you know, is arguing that, okay, the lack of cooperation didn't go to the admissibility of the evidence. However, he said without any corroboration, it ought not be granted any weight. And so I think you can argue the weight of the evidence without making that objection at trial. That's just an issue for the, that doesn't go to the admissibility. So I think his argument is, is that, uh, even though the evidence was admissible, he's not agreeing with the preliminary thing, but assuming it's admissible, it ought not be given any weight because of lack of cooperation. And of course my response would be, you know, the, the trial court gave it the weight that it felt that it should receive. Um, you were trial counsel all the way through, right? Yes. Um, did the trial judge ever talk to the child? No. Um, did the trial judge to your knowledge, do any balancing with regard to prejudice versus probative value? Uh, he, he reviewed our, my motion, uh, and the case law in his chambers. Um, what balancing act he may have done on his own. He did not share with us. Okay. Thank you. Uh, and then of course my final argument was that, um, obviously there was enough weight to support the order of protection. Uh, even if you look at, take out the sexual issues, uh, Daniel on multiple occasions had, uh, threatened to take the children away from Julie, to take them someplace warm, to take them to China, to, he made all these statements suggesting that he was going to take the kids away from her, conceal them. Uh, and on that basis, at the very least, the order of protection should be, uh, should be upheld. Well, what did he do with regard to the last argument that you just made? I mean, was, were those serious things or was he just talking? Well, he's from Guatemala and he told the kids that he was taking them someplace warm. Our concern is that he would take the kids back to Guatemala or take them. Okay. What I'm trying to find out is exactly, you know, what did he say to Julie? Did he say, I'm taking the kids away from you forever? What, what did he say? I believe the statement about taking the children someplace warm was made, uh, to the children. I believe taking the child, taking the children to China was made to Julie. Um, and obviously he doesn't have any, um, as far as I know, Chinese contacts. But, um, are those the only two statements that you're aware of? Uh, yes, off the top of my head. That's true. I can't remember if I referenced more in my brief, but yes, that's what comes to mind. And one was made to the children, not to Julie. Okay. That he was going to take them someplace warm. Correct. Okay. Thank you. Yes. Uh, he did, um, also tell the children or ask the children to tell Julie that they wanted to live with him. He wanted to make it, um, you know, we believe that he was priming the children to, uh, tell Julie things that were favorable to him or that, uh, for other, for instance, he did other things, like he would tell the children to hit Julie at parenting time exchanges. So the children would hit Julie. She'd ask, why are you hitting me? Well, daddy told me to do it. That he was putting these things in the children's mind, uh, to essentially put the children against her. Um, for the protection of the children, uh, certainly believe that the order of protection, uh, was worthy of being granted for both her and the children. And I have no further argument. Well, let me, let me ask you a question just so I'm clear. If you would outline for me exactly what evidence you believe corroborates, uh, the, uh, uh, uh, allegations of abuse. Uh, I'm sorry. No, no, I'm, I'm done with my question. Prior acts. Most certainly, uh, Daniel has a history of sexual molestation of young children. He was, he testified to being 14. There was other evidence that he was 16 at an orphanage in Guatemala, uh, that he masturbated on several little children, uh, between the ages of five and seven years old, that there were multiple little girls involved in this. Uh, he testified to his pornography watching. Um, and he, uh, spanked the babysitter and gave her a suggestive hug and, uh, she was only 16 at the time. Um, and that he took, uh, so that was one thing, the prior acts. And I believe, uh, I've provided case law within the brief that, um, where it was, uh, approved to, to consider prior acts within, um, weighing the evidence. Um, okay. What was the other, you had asked what asking, I'm asking what, if you would give me a list of every, of the evidence of each bit of evidence that you believe, uh, uh, corroborates the allegations that he abused these children. Uh, they did have red anuses and red penises when they came home. So there was physical evidence. And, uh, I did provide case law where non-medical evidence was considered admissible, um, of course their statements and, uh, their interaction with the GAL, how, especially the young one just shut down when any mention of dad was, was brought up. Like he clearly did not want to talk about his father. Could you spell out what their statements were? A verbatim? No, no, just generally. Uh, daddy touched my penis. Um, daddy hurt me. Um, they like, they mentioned other, the oldest one mentioned that his favorite thing to do was to sleep with daddy. Um, so they've made other statements that, uh, Daniel would only let the children into his bedroom one at a time. So if he would allow one in and then that child would have to leave and then he would allow the other, but then this was only after he spent time on the computer and so the circumstances of that, um, were of course odd. Um, uh, he, uh, there were other references about, um, the kids would mention how Daniel told him how, you know, that Julie took all of his money, that the house was still his, um, and other parenting squabbles like that. And you're saying, is that also corroboration of abuse? Separate from sexual abuse to be, that supports the order of protection, uh, with respect to harassment is my argument. Okay. Are there any other questions for Ms. Straub? No. Thank you. Okay. Um, Mr. Angel, any rebuttal? Yes. Thank you, Justice McDade. Um, as far as the, uh, the, uh, or the orders, um, basically as, as the court noted, they're the same, same hearing, same, same person, both were under the D case, um, allegations were the same. Um, the notice of appeal is liberally construed. Uh, there's no even remote argument as far as prejudice here. So, and clearly we could not move to modify what supposedly is an emergency order, which has gone on about a year while this appeal was pending. So we would respectfully state that you have jurisdiction to consider, consider both, both orders. As far as corroboration, uh, uh, goes, yeah. Justice Schmidt was correct that, um, by having a hearing we're, we're no, no corroboration and, um, much less the corroboration that's been found in other, other cases, uh, with respects to threats to take the children away. Um, besides having a multiple hearsay issue that extends statements to the children, um, this, these statements are vague. They can mean about anything. I mean, someplace warm. I mean, does that mean taken before or for vacation or does it mean permanently deprive them? Um, nothing as Justice McDade noted, there's nothing to show there's any seriousness or plan. Um, no showing he has connections to China, no showings that he could even get back to Guatemala or even want, would want to get back to Guatemala. With respect to the, uh, kids hitting Julie, um, the kids also hit Daniel. I mean, that's in the record and the idea that he's going to have the kids, um, tell the kids to hit her when he's been asking for more time just doesn't make any sense, um, and finally, the, uh, acts of as far as corroboration goes. Um, most of what, pretty much all of Guatemala was, um, hearsay. Um, Daniel on his own told Julie what he, um, did when he looked at the vagina when he was 14 years old of a seven-year-old child, um, maybe it's five to seven, um, if he was going to lie about it, there's some question of why would he even tell her at all? Um, and then the rest of it is just basically putting different things together to try and create a misleading picture that, okay, that he, he supposedly he watches pornography. Well, watching pornography for better or worse is legal. Uh, there's no, no allegation that he's ever watched pornography when the children were present. Um, I mean, if we're talking about this goes to the, to the way to be given to with the child statement. I mean, isn't that really the judge's purview to decide whether he's going to give that some weight? I mean, maybe it's legal, but you know, we see all kinds of, you know, you can't drink in the presence of your children while that's not illegal, but. Some, you know, sometimes that you see that in parenting time orders or, you know, so isn't this, uh, aren't these events, um, you know, uh, looking at a girl, a child's vagina that was five years old when he was 14 and looking, um, you know, spanking or hugging the babysitter, aren't those all things that the trial judge considered and decided what weight to afford them? Justice O'Brien, there, there is a lot of logic to that because, uh, the trial judge does hear the evidence and has to weigh it, but in this case, as the corroboration requirement is clear, there's gotta be some logical limits. At some point, it's just, it's so attenuated as irrelevant. That's what the juvenile court cases say is at some point, um, you're basically here, we're looking to sever a parent child relationship at some point. It's just too much of a stretch. Um, I agree. A parent shouldn't watch pornography while child child was present, but I what happened here, uh, with, with the, the babysitter, uh, and so that the babysitter didn't testify, uh, which if he had supposedly thrust himself towards her, we would expect her to be a witness and there's not going to be anything as far as rehabilitation. My understanding is it was just a hug that made her uncomfortable. The church did an investigation. He kept himself away and that was basically the end of it. Um, and also, uh, there, uh, I think the oldest child said he, he liked this, he liked to sleep in the same bed with dad, which is what happened when the parties were married, the children slept with them. He didn't say that was his, I don't believe he said that was his favorite thing to do, or that was the only thing he liked to do. So it's just, it's just basically taking things out of context and creating a misleading picture. So for those reasons, um, we don't believe, we would respectfully submit the, the, was, uh, insufficient corroboration to sustain the judge's decision. Well, let me, let me ask you one thing you haven't talked about was the physical evidence, uh, the photos. Okay. Um, yeah, my, my understanding is, is that the, uh, the photos are not specific, uh, for anything other, other than, than diaper rash. We don't have any medical testimony, which says that, Hey, this is, this, this is a sexual abuse, uh, or this would be the only source. And if we had something which says like the other cases like AP were, Hey, this is, this is what, uh, this is, and I've eliminated alternative causes, such as the child falling or the child masturbating or something like that. That would be one thing here. We don't have anything. These, these were the same photos seen by DCFS by the same team. Um, the, the reports were unfounded. Uh, there's no, no, no indication that anybody, any professional involved in this thought that this amounted to evidence of, of abuse or even said what type of abuse this is. Okay. Thank, thank you. Are there any other questions? No. Okay. We thank both of you for your arguments this morning. We'll take this matter under advisement and we'll issue a written decision as quickly as possible. Uh, the court will now stand in brief recess until noon.